IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| STANFORD ANTHONY WILLIAMSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:26-cv-898 (RDA/WEF) |
| ) | |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on *pro se* Plaintiff Stanford Anthony Williamson's

Motions for a Temporary Restraining Order ("TRO") and for a Preliminary Injunction ("PI").

Dkts. 7, 8. Defendants have responded in Opposition. Dkt. 16. This Court has dispensed with

oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil

Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the

Amended Complaint (Dkt. 6), along with the Motions (Dkts. 7, 8), the Opposition (Dkt. 16), and

the Reply (Dkts. 19, 20), the Court denies the Motions for the reasons that follow.

I.    BACKGROUND

A.    Regulatory Scheme

Congress has recognized that certain drugs present a specific potential for abuse and danger

to the public and therefore enacted the Controlled Substances Act (the "CSA"). *See* 21 U.S.C.

§§ 801-971. The CSA gives the Drug Enforcement Administration ("DEA") broad authority to

regulate the distribution of controlled substances and creates a closed system of distribution in

which all persons involved in the "legitimate distribution chain" of controlled substances must

register with the DEA. *See Wedgewood Village Pharmacy v. D.E.A.*, 509 F.3d 541, 542 (D.C. Cir.

2007). As part of this closed system, each link in the chain (manufacturer, distributor, or

practitioner) has distinct requirements for registration. *Id.* Included in this registration requirement are physicians such as Plaintiff who prescribe controlled substances. 21 U.S.C. § 822(a)(2); 21 C.F.R. § 1301.13(e). In evaluating an application for registration, the DEA must determine whether registration is in the public interest, including whether the registrant has complied with state and local laws. 21 U.S.C. § 823(a).

A registrant must, on occasion, renew the registration at regular intervals. *See* 21 C.F.R. § 1301.13(e)(3). The DEA "closely observes [registrants] to ensure that their operations are 'consistent with the public interest.'" *Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017). A registrant may voluntarily rescind his or her registration to dispense controlled substances. 21 U.S.C. § 822(a)(3). A registrant may also "surrender for cause" their registration, but that act carries collateral consequences. *See* 21 U.S.C. § 822(a)(3)(A)(iv). In surrendering for cause, a registrant certifies: "In view of my alleged failure to comply with the Federal requirements pertaining to controlled substances . . . , and as an indication of my good faith in desiring to remedy any incorrect or unlawful practices on my part, I hereby surrender for cause my Drug Enforcement Administration (DEA) Certificate of Registration." Dkt. 6-3 (Plaintiff's 2024 surrender of his Florida registration). The DEA requires registrants who surrender their registration to disclose that fact in future applications. Dkt. 16-1 at 4 ¶ 5(c)(i). Furthermore, if the DEA is investigating a registrant, it will not accept a voluntary rescission or retirement of a registration and will instead require a voluntary surrender. *Id.* ¶ 5(c)(iii).

The DEA also has the authority to revoke or suspend an individual's registration. 21 U.S.C. § 824(a)(4). If the DEA believes that a registration should be revoked or suspended, it will generally serve an order to show cause upon the registrant. 21 C.F.R. § 1301.37(b). That order to show cause ("OSC") commences an administrative proceeding before a DEA Administrative Law Judge ("ALJ") and must "contain a statement of the basis for the . . . revocation, or suspension."

2

21 C.F.R. § 1301.37(c); *see also* 21 C.F.R. § 1301.36(d); *Prescript Pharmaceuticals, Inc. v. DOJ*, 2025 WL 1423656, at \*1 (D.D.C. May 16, 2025). But these requirements can be waived if the DEA "has reason to believe that a registrant's continued operation would pose 'an imminent danger to the public health or safety.'" *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 207 (D.D.C. 2012) (citing to 21 U.S.C. § 824(d)). In that scenario, the DEA may "suspend that party's registration immediately, prior to an administrative hearing, by issuing an immediate suspension order." *Id.* (citing 21 U.S.C. § 824(d)). Immediate suspension is appropriate when, "in the absence of [it,]" there is a "substantial likelihood" that "death, serious bodily harm, or abuse of a controlled substance will occur." *Id.* (citing 21 U.S.C. § 824(d); *Virtus Pharmaceuticals, LLC v. Garland*, 2021 WL 4306165, at \*2 (D.D.C. Sept. 22, 201)). An immediate suspension order ("ISO") must "contain a statement of [the Administrator's] findings regarding the danger to public health or safety." 21 C.F.R. § 1301.36(e). Additionally, a registrant "may request a hearing on the revocation or suspension of his/her registration at a time earlier than specified in the order to show cause," and "[t]his request shall be granted by the Administrator, who shall fix a date for such hearing as early as reasonably possible." 21 C.F.R. § 1301.36(h).

Although these administrative hearings are informal in nature, 21 C.F.R. § 1316.51(a), the "hearing officer" – typically a DEA ALJ – has the authority to "[h]old conferences to settle, simplify, or determine the issues in a hearing," "[s]ign and issue subpoenas to compel the attendance of witnesses and the production of documents and materials," "[e]xamine witnesses," and "[r]eceive, rule on, exclude, or limit evidence." *Id.* §§ 1316.52(b), (d)-(f). After the conclusion of the hearing, the DEA ALJ is required to "prepare a report" that includes "[h]is recommended findings of fact or conclusions of law" and "[h]is recommended decision." *Id.* § 1316.65(a). After the ALJ's report is issued, the parties may file objections, and then the DEA Administrator reviews

them and issues a final report, which is published in the *Federal Register*. *Id.* §§ 1316.66(a), 1316.67.

A registrant is then entitled to Article III judicial review, but only in the United States Court of Appeals for the Circuit in which the registrant is located or the District of Columbia Circuit. *See* 21 U.S.C. § 877. The statute also provides a limited additional avenue for judicial review of the ISO before the DEA Administrator issues a final order. 21 U.S.C. § 824(f).

### B.      Factual and Procedural Background

Plaintiff is a physician who holds medical licenses in both Georgia and Florida and who generally practices pain management as a "interventional pain specialist." Dkt. 6 ¶¶ 1, 14; Dkt. 16-1 at 7-8.[1] Before the events giving rise to this action, Plaintiff held three DEA registrations (one in Florida and two in Georgia). Dkt. 16-1 at 8 ¶ 4; Dkt. 6.

In 2023, the DEA commenced an investigation into the practices of certain individuals at an unlicensed pain clinic in Florida. Dkt. 16-1 at 2 ¶ 3. In connection with that investigation, the DEA learned that Plaintiff was involved with that clinic. *Id.* The DEA's Miami Office thus sought to interview Plaintiff. *Id.* at 7 ¶ 3. In preparing for that interview, Diversion Investigator Adam Ferguson learned that on a single day – July 15, 203 – Plaintiff wrote 32 prescriptions, 27 of which were for Schedule II controlled substances (oxycodone and morphine). *Id.* at 9 ¶ 4(d). Four of those prescriptions used Plaintiff's Georgia registration and the remainder used his Florida registration. *Id.* Ferguson also learned that Plaintiff's Georgia license to operate one of his Georgia pain clinics expired in July 2020, yet Plaintiff continued to operate for three years before seeking reinstatement of that license in June 2023. *Id.* at 8 ¶ 4(b)(i). In October 2023, Plaintiff had an interview with Ferguson and another DEA investigator. *Id.* at 9 ¶ 5. In that interview,

---

[1] Unless otherwise indicated, page numbers reflect the CM/ECF assigned pages.

Plaintiff reported that he "took the word" of the alleged proprietor of the unlicensed pain clinic that Plaintiff could prescribe controlled substances to Florida residents through telehealth and that he never confirmed whether the pain clinic through which he was operating had an active license. *Id.* Plaintiff confirmed that he saw all of the Florida patients exclusively through telehealth visits. *Id.* He also conceded that the patient notes for those patients that he did see in person did not contain a history or recount a physical exam and did not reflect any attempt to solve the patients' pain with anything other than opioids. *Id.* The DEA therefore decided to investigate Plaintiff further.

Ferguson and Diversion Investigator Melissa Szwanke then conducted a second interview of Plaintiff in March 2024. *Id.* at 10-11. During that interview, Szwanke informed Plaintiff that prescribing Schedule II controlled substances to Florida residents via telehealth visits violated Florida law. *Id.* at 3 ¶ 5(a); *see* Fla. Stat. § 456.47(2)(c). Ferguson and Szwanke also explained to Plaintiff his potential legal exposure as a result of his Florida work, including the possibility that the DEA would continue its investigation and the possibility of criminal charges. *Id.* at 4 ¶ 5(c); *Id.* at 11-12 ¶ 8. They further explained that the DEA had significant concerns about Plaintiff's Georgia registrations, given what had been uncovered, namely in relation to prescriptions that Plaintiff had written with high Morphine Milligram Equivalents ("MME"). *Id.* at 11 ¶ 7. In particular, Ferguson explained that Plaintiff had prescribed controlled substances to his spouse, a violation of Georgia law. *Id.*

Ferguson and Szwanke then requested that Plaintiff surrender for cause both his Florida and Georgia Registrations. *Id.* at 11-12 ¶ 8. Plaintiff then noted that, after the October 2023 interview, he had attempted to "retire" his Florida registration voluntarily. *Id.* at 4-5 ¶ 5(c)(iii). Plaintiff had apparently mistyped the DEA electronic mail address. Dkt. 6-2. Nonetheless, Szwanke reports that, based on her experience, it is unlikely that the DEA would have accepted

such retirement, because he was already under investigation. Dkt. 16-1 at 4-5 ¶ 5(c)(iii). Plaintiff then agreed to surrender his Florida registration and executed a DEA Form 104. Dkt. 6-3. Plaintiff requested additional time to consider his Georgia registration and so Ferguson left an administrative subpoena for certain patient records pursuant to the investigation of that registration. Dkt. 16-1 at 11-12 ¶¶ 8-9.

Plaintiff complied with the subpoena, and the DEA retained a Georgia physician to review the records who opined that the prescription practices were not consistent with the Georgia standard of care. *Id.* ¶ 10. Ferguson then served additional administrative subpoenas on Plaintiff. *Id.* ¶ 11. After receiving the response and having the same expert review the files, the expert opined that the prescription practices were not consistent with the Georgia standard of care. *Id.*

Based on the information collected, on October 9, 2025, the DEA Administrator issued an Order to Show Cause and Immediate Suspension of Registration ("OSC/ISO") to Plaintiff. Dkt. 16-1 at 16-26. That document asserts that, between April 2020 and April 2025, Plaintiff "violated federal law and Georgia law by issuing numerous prescriptions for Schedules II-IV controlled substances outside the course of professional practice and not for a legitimate medical purpose." *Id.* at 19. In particular, the OSC/ISO asserts that "you failed to conduct or document adequate patient evaluations and histories necessary to establish a medical diagnosis justifying the necessity for the prescriptions, failed to adequately monitor patient progress, and prescribed dangerous combinations such as oxycodone simultaneously with prescriptions for a benzodiazepine." *Id.* The OSC/ISO then reviews the treatment of eight different patients that the DEA believes fell into these categories. *Id.* The OSC/ISO asserts that Plaintiff engaged in "egregious misconduct" and that his "ongoing prescription of dangerous opioids outside the usual course of professional practice poses an 'imminent danger.'" *Id.* at 24.

On November 6, 2025, Plaintiff requested a hearing before a DEA ALJ. Dkt. 6 ¶ 37. Plaintiff asserts, and Defendant agrees, that "there were no DEA ALJs on staff to whom plaintiff's OSC/ISO could be assigned." Dkt. 16 at 7 (citing Dkt. 6 ¶38).

On March 31, 2026, Plaintiff filed his initial Complaint in this action and sought leave to proceed *in forma pauperis* as well as emergency injunctive relief. Dkts. 1, 2, 3, 4. That same day, an ALJ was assigned to the case and issued an Order setting forth a schedule in the matter. Dkt. 16-1 at 30-34.

On April 2, 2026, this Court denied Plaintiff's motion to proceed *in forma pauperis* and then screened Plaintiff's Complaint pursuant to 28 U.S.C. § 1915(e) and analyzed Plaintiff's emergency motions. Dkt. 5. The Court noted that there were insufficient facts to demonstrate a likelihood of success on the merits or to plausibly state a claim. *Id.* Accordingly, the Court dismissed the case without prejudice and denied the pending motions. *Id.*

On April 23, 2026, Plaintiff filed his Amended Complaint and the pending Motions for injunctive relief. Dkts. 6, 7, 8. Despite that March 31, 2026 assignment of an ALJ, Plaintiff's Amended Complaint asserted that the Amended Complaint sought "to challenge the DEA's unlawful actions, to compel assignment of an ALJ, to vacate the ISO, and to restore his ability to practice medicine pending a full and fair hearing." Dkt. 6 ¶ 10.

Due in part to this allegation that no ALJ had been assigned, the Court issued an Order directing the Defendants to respond. Dkt. 13. On May 7, 2026, Defendants sought and obtained an extension of the deadline to respond. Dkts. 14, 15. On May 12, 2026, Defendants filed their Opposition. Dkt. 16. On May 18, 2026, Plaintiff filed his Reply. Dkts. 19, 20.

## II. STANDARD OF REVIEW

The standards for a temporary restraining order ("TRO") and a preliminary injunction ("PI") are largely the same and derive from *Winter v. National Research Defense Council, Inc.*,

7

555 U.S. 7, 22 (2008). A motion for a preliminary injunction is also subject to the requirements of Federal Rule of Civil Procedure 65. "A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) (quoting *Winter*, 555 U.S. at, 22). "[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994). A grant of preliminary injunctive relief requires the movant to establish the following four factors: (1) the likelihood of irreparable harm to the plaintiff if preliminary relief is denied; (2) the likelihood of harm to the defendants if the preliminary injunction is granted; (3) the likelihood that the plaintiff will succeed on the merits; and (4) the public interest. *Winter*, 555 U.S. at 20.

### III. ANALYSIS

Plaintiff bears a heavy burden in seeking injunctive relief. Although Plaintiff's Amended Complaint contains more allegations than his original complaint, it still rests mainly on vague and conclusory allegations. *See, e.g.*, *Thompson v. Clarke*, 2018 WL 4855457, at *3 (W.D. Va. Oct. 5, 2018) (holding that "self-serving and conclusory statements . . . cannot underpin a preliminary injunction"); *Pelzer v. McCall*, 2010 WL 4338055, at *2 (D.S.C. Oct. 25, 2010) ("Plaintiff's vague and conclusory statements are simply insufficient to warrant the extraordinary remedy of injunctive relief."). Moreover, it appears that the primary allegation that concerned the Court – the lack of an ALJ – was incorrect at the time that the Amended Complaint was filed. A review of the applicable *Winter* factors confirms that Plaintiff has failed to meet his burden, and therefore the Motions will be denied.

A.   Likelihood of Success on the Merits

As judges in this District have previously held, where multiple causes of action are alleged, "finding a likelihood of success on only one claim is sufficient to 'justify injunctive relief.'" *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 494 n.3 (E.D. Va. 2021). Thus, the Court analyzes each claim alleged to support injunctive relief separately, but, because certain counts are related to one another, the Court may not address the claims in the same order as argued by the parties.

i.   *Delay in Assigning an ALJ*

In Count 1, Plaintiff asserts a violation of the Administrative Procedure Act, 5 U.S.C. § 706. This claim appears to be moot[2] and based on allegations that, at the time they were made, were not true. In his Amended Complaint, Plaintiff alleged that no ALJ had been assigned, but weeks before he filed the Amended Complaint, an ALJ *had* been assigned. Dkt. 16-1 at 30-33 (reflecting that an ALJ issued a schedule on March 31, 2026, *before* Plaintiff's Amended Complaint was filed).[3] Thus, Defendants have done what Plaintiff sought to compel, and there is nothing for the Court to remedy. *See Zevallos v. Obama*, 10 F. Supp. 3d 111, 123 (D.D.C. 2014) ("All this Court can do is 'compel agency action . . . unreasonably delayed,' i.e., compel OFAC to issue *a* decision – which it has already done." (emphasis in original)), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *see also Martinez v. United States*, 670 F. App'x 933, 934 (9th Cir. 2016) ("The BLM

---

[2] "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969).

[3] In this regard, the Court is compelled to warn Plaintiff that, although he is proceeding *pro se*, he "still must abide by the clear requirements of Rule 11." *Katti v. Moore*, 2006 WL 3424253, at *5 (E.D. Va. Nov. 22, 2006). Federal Rule of Civil Procedure 11 requires that representation to the Court must be "to the best of the person's knowledge, information, and belief formed after an inquiry reasonable under the circumstances." Fed. R. Civ. P. 11(b). If a litigant, including a *pro se* litigant, fails to comply with his obligations under Rule 11, then that litigant may be subject to sanctions. *Id.* at 11(c).

9

acted on plaintiffs' application by sending plaintiffs a letter . . . acknowledging receipt of their application and pointing out several deficiencies in the application."). Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits in this regard.

ii.     *The Issuance of the OSC/ISO*

Plaintiff further challenges the issuance of the OSC/ISO and the suspension of his registration. Dkt. 6 at 9-10. Plaintiff asserts that the OSC/ISO was issued "without explanation, factual basis, or opportunity to respond" such that it was arbitrary and capricious. *Id.* ¶ 67. These allegations are conclusory and cannot form the basis for injunctive relief. *See, e.g.*, *Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007, at *2 (C.D. Cal. July 13, 2020) ("The issuance of a TRO or other injunctive relief is not justified upon a plaintiff's mere allegations of wrongdoing."). And, in any event, Plaintiff's arguments in this regard are not well taken as Defendants have now adduced evidence demonstrating that the OSC/ISO does provide an explanation and has a factual basis.[4]

As both parties recognize, this Court may only set aside the OSC/ISO if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Supreme Court has recognized arbitrary and capricious review is "limited" and "narrow." *Holly Hill Farm Corp. v. United States*, 447 F.3d 258, 263 (2006). The omissions from Plaintiff's Amended Complaint and Motions, in light of the evidence provided with the Defendants'

---

[4] Despite previously making only vague arguments regarding the OSC/ISO in his opening brief, Plaintiff now "disputes numerous factual allegations in the OSC/ISO." Dkt. 19 at 6. But arguments may not be made for the first time in a reply brief. *See, e.g.*, *Buser v. So. Food Serv., Inc.*, 73 F. Supp. 2d 556, 568 n.12 (M.D.N.C. 1999) (refusing to consider arguments made for the first time in a reply brief); *Clawson v. FedEx Ground Packaging Sys.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."). Moreover, Plaintiff's disputes are generally vague and unsupported. And, even with Plaintiff's disputes, such disputes do not render the OSC/ISO a "clear error in judgment," which Plaintiff concedes as the applicable standard. Dkt. 19 at 6.

Opposition, are stark. As the discussion of the regulatory scheme recited *supra* establishes, the DEA Administrator has the discretion to suspend a registration where "there is an imminent danger to the public health and safety." 21 U.S.C. § 824(d)(1). That phrase is further defined as a "substantial likelihood an immediate threat that death, serious bodily harm, or abuse of controlled substance will occur in the absence of immediate suspension." *Id.* § 821(d)(2). Here, Plaintiff cannot demonstrate a clear showing that the DEA Administrator has made a clear error in judgment or otherwise acted in an arbitrary and capricious manner.

As detailed *supra*, far from being issued without explanation, the OSC/ISO is ten pages long and contains detailed allegations regarding Plaintiff's failure to comply with the law or medical standards of care. Dkt. 16-1 at 16-26. The OSC/ISO references Plaintiff's specific alleged failings with respect to *eight* different patients. *Id.* For example, with respect to Patient S.H., the OSC/ISO recounts how each month Plaintiff issued prescripts for controlled substances (namely Schedule II opioids), despite failing to establish a medical condition to support the long-term use of such drugs and that Plaintiff, among other things: (i) failed to perform or document a physical examination; (ii) failed to document an objective medical diagnosis; (iii) failed to address failed urine screens in which S.H. tested positive for non-prescribed controlled substances; and (iv) failed to keep adequate notes or documentation. *Id.* The OSC/ISO further recounts that the treatment of these eight patients was reviewed by an independent medical expert who confirmed that "your issuance of these prescriptions fell below the minimal medical standards applicable to the practice of medicine in Georgia." *Id.* at 24. Finally, the OSC/ISO found that such continued practices constituted an imminent danger. *Id.*[5] Courts routinely deny motions premised on the issuance of

---

[5] Plaintiff argues that the six-month delay in assigning an ALJ undermines the conclusion that there was an imminent danger. Dkt. 19 at 4. Not so. Once the OSC/ISO issued and suspended Plaintiff's registration the imminent danger was addressed. That it took a significant period of

an ISO, where there is a conclusion based on a review of the medical records that "the listed prescriptions were dispensed outside the usual course of professional practice . . . in violation of federal and state law." *Evergreen Pharmacy, Inc. v. Garland*, 621 F. Supp. 3d 861, 875 (N.D. Ill. 2022); *see also Akhtar-Zaidi v. Drug Enforcement Administration*, 841 F.3d 707, 713 (6th Cir. 2016) (finding that a failure to comply with state and federal laws concerning the dispensing of controlled substances can create a substantial likelihood that abuse of controlled substances would occur in the absence of an immediate suspension).  Thus, on this record, Plaintiff has failed to establish a likelihood of success on the merits of his claim that Defendants acted arbitrarily or capriciously.

### iii.    *Surrender of the Florida Registration*

Finally, Plaintiff seeks injunctive relief with respect to his March 2024 surrender of his Florida DEA registration.  Dkt. 6 at 10.  In this regard, Plaintiff argues that the DEA "coerc[ed] the surrender of his Florida registration under threat of prosecution." *Id.* There are no substantive factual allegations in the Amended Complaint, TRO Motion, or PI Motion which support Plaintiff's conclusory allegations that he was coerced into surrendering his Florida registration. Dkts. 6, 7, 8.  Moreover, as Defendants note, Plaintiff made this decision two years ago, thus it is unclear on what basis this years-old decision could support emergency injunctive relief now.  *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989) (holding that because "an application for a preliminary injunction is based upon an urgent need for the protection of [a] plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required" (internal citations omitted)).  And, as to the substance of Plaintiff's vague argument, courts have rejected similar due process challenges except where governmental conduct shocks the conscience.

---

time to assign an ALJ is unfortunate, but that Defendants did not urgently address Plaintiff's request for review does not mean that the issuance of the OSC/ISO itself was not urgent.

12

*See Rochin v. California*, 342 U.S. 165, 172 (1952).  But warning an individual of potential criminal exposure does not satisfy that standard.  *Cf. Bordenkircher v. Hayes*, 434 U.S. 357, 364-65 (finding no due process violation where a prosecutor threatened to seek additional charges if the defendant did not plead guilty).  Finally, the record here does not establish that Plaintiff was coerced[6] where, at the same time Plaintiff surrendered his Florida registration, he sought and received additional time to consider whether to surrender his Georgia registration.  *See* Dkt. 16-1 at 11-12 ¶ 8.  Plaintiff's arguments in this regard are further undermined by his Reply, which asserts that he had an interest in "retiring" his Florida DEA registration.  Dkt. 19 at 3.[7]

---

[6] To the extent that Plaintiff argues that there is a dispute regarding "coercion," this does not support granting Plaintiff's Motions.  Dkt. 19 at 4-5.  In the first instance, the burden is on Plaintiff to demonstrate a likelihood of success on the merits.  Thus, a dispute where the arguments are of equal weight does not support the issuance of injunctive relief.  More importantly, Plaintiff has not submitted any evidence of coercion.  Plaintiff's allegations are not made under penalty of perjury.  Finally, Plaintiff cites no authority supporting that any of his allegations would constitute coercion in violation of due process.  Indeed, Plaintiff's allegations regarding the threats of criminal charges demonstrates how unlikely it is for Plaintiff to succeed on his allegations in this regard.  Plaintiff asserts that it violates due process for the DEA to threaten criminal prosecution for violating the law "without any prior notice or warning to Plaintiff that his prescribing conduct was under scrutiny."  Dkt. 19 at 5.  But due process does not require a warning to a potential criminal defendant that he could be charged, before he is charged.  *See United States v. Dotterweich*, 320 U.S. 277, 278–79 (1943) (holding that, even in a criminal prosecution, a defendant is not required to be permitted an opportunity to give his views as a perquisite to prosecution).

[7] In his Reply, Plaintiff makes the following argument: "Furthermore, Defendants' own declaration states that Plaintiff was 'under investigation' at the time of the October 2023 retirement request.  Plaintiff's disputes this characterization.  According, to the DEA's own prehearing statement, the investigation of Plaintiff began 'in approximately July 2023.'  Yet the October 2023 meeting – which DI Ferguson himself characterized as a consensual interview to gather information about the unlicensed Florida clinic – was presented to Plaintiff as an informational meeting, not a notification that he was a target."  Dkt. 19 at 3.  But none of these matters are contradictory.  If an investigation began in July 2023, that does not render Ferguson's declaration that Plaintiff was still under investigation in October 2023 inaccurate.  Moreover, that Ferguson and Szwanke sought information regarding both the Florida clinic and Plaintiff does not render the interview either nonconsensual or not for informational purposes.

Accordingly, Plaintiff has not demonstrated a likelihood of success on the merits in this regard.[8]

### B.   The Balance of Equities/Public Interest

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the CSA itself provides for the action taken by Defendants here. 21 U.S.C. § 824(d)(1) (providing for immediate suspension where there is an "imminent danger to the public health and safety"). Defendants have a "strong interest in enforcing the CSA and ensuring that pharmaceutical drugs are not improperly diverted while the administrative proceedings before the DEA are pending." *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 230 (D.D.C. 2012). Here, where the OSC/ISO sets forth Defendants' findings regarding the danger to the public health and safety presented by Plaintiff's continued ability to prescribe controlled substances, the balance of equities and the public interest weighs in favor of Defendants.

### C.   Irreparable Harm

Defendants did not address whether Plaintiff faces irreparable harm given their analysis of the other *Winter* factors. Dkt. 16 at 30 n.15. Although a review of the other factors supports denial of the Motions, the Court nonetheless briefly addresses the risk of irreparable harm. Plaintiff claims irreparable harm based on: (i) loss of income; (ii) loss of participation in the Veterans Affairs Community Care Network ("VA CCN"); (iii) loss of referrals; (iv) unpaid claims; (v) reputational damage; (vi) inability to treat veterans; and (vii) imminent collapse of his medical

---

[8] To the extent that Plaintiff now attempts to frame his due process claim as a procedural due process claim, Plaintiff has similarly not established a likelihood of success on the merits. Dkt. 19 at 4. As previously addressed, Plaintiff is not in "indefinite administrative limbo" and is receiving "post-deprivation process" because the assigned ALJ has set a schedule for matters. Dkt. 6 at 10. Moreover, Plaintiff cites no authority establishing that he is entitled to "pre-deprivation process." *Id.* Indeed, the CSA itself provides for immediate suspension, which would suggest that Plaintiff is not so entitled. 21 U.S.C. § 824(d).

practice. Dkt. 8 at 3-4. But, as the Supreme Court has recognized "temporary loss of income," which would be restored if a plaintiff is successful in the prosecution of their claim, "does not usually constitute irreparable injury." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). So too, the damages to reputation as a result of Defendants' action do not constitute irreparable injury. *Id.* at 91 ("Assuming for purposes of discussion that respondent had made a satisfactory showing of loss of income and had supported the claim that her reputation would be damaged as a result of the challenged agency action, we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction in this type of case."). Similarly, Plaintiff has not supported his conclusory claims regarding any of his injuries, particularly where, although Plaintiff has lost his ability to prescribe controlled substances, he has not lost his ability to practice medicine. Accordingly, Plaintiff has also failed to satisfy his burden in this regard.

## IV. CONCLUSION

In short, Plaintiff has failed to meet his burden with respect to any of the *Winter* factors. Indeed, the allegation that had given the Court the most pause – the lack of an ALJ – was resolved the same day that Plaintiff filed his Complaint in this matter. Plaintiff's failure to subsequently correct that allegation and, indeed, his continued allegations in that regard in his Amended Complaint raise serious issues regarding Plaintiff's compliance with Rule 11. Ultimately, Plaintiff has not demonstrated a likelihood of success on any of his claims in his Amended Complaint nor has he demonstrated a non-conclusory risk of irreparable harm or that the balance of the equities and public interest weigh in his favor.

Accordingly, it is hereby ORDERED that the Motions (Dkts. 7, 8) are DENIED.

To appeal the denial of the Preliminary Injunction, Plaintiff must file a written notice of appeal with the Clerk of Court within 60 days of the date of entry of this Order. A notice of appeal

15

is a short statement indicating a desire to appeal, including the date of the order that Plaintiff wants

to appeal. Plaintiff need not explain the grounds for appeal until so directed by the court of appeals.

Failure to file a timely notice of appeal waives Plaintiff's right to appeal this decision.

The Clerk is directed to send a copy of this Order to Plaintiff who is proceeding *pro se* at

his address of record and to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
May 20, 2026

/s/

Rossie D. Alston, Jr.
United States District Judge